**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| A.R.D.A., a minor, by and through his next friend NESTOR ROSALES DUBON; and NESTOR ROSALES DUBON in his individual capacity. | ) ) ) ) ) ) |
| *Petitioners-Plaintiffs*, | ) ) ) |
| v. | ) ) |
| SCOTT LLOYD, Director, Office of Refugee Resettlement; JONATHAN WHITE, Deputy Director, Office of Refugee Resettlement; STEVEN WAGNER, Acting Assistant Secretary for the Administration for Children and Families, U.S. Department of Health and Human Services; ALEX AZAR, Secretary, U.S. Department of Health and Human Services; NATASHA DAVID, Federal Field Specialist, Office of Refugee Resettlement; JOHNITHA MCNAIR, Executive Director, Northern Virginia Juvenile Detention Center | ) ) ) ) ) ) ) ) ) ) ) |
| *Respondents-Defendants*. | |

Case No.  1:18-cv-944 (LOG/TCB)

**PETITION FOR A WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1.     This lawsuit challenges and seeks redress from the Defendants' unlawful and prolonged detention of A.R.D.A[1], a 16-year-old unaccompanied immigrant minor who made the perilous journey to the United States to seek asylum from Honduras.

2.     A.R.D.A. suffers from trauma and a severe mental illness disability. For more than one year and three months, A.R.D.A., has been detained in the custody of Defendants, including the Office of Refugee Resettlement ("ORR"), the agency responsible for the care of immigrant children like A.R.D.A., in violation of his due process right to liberty. During the near entirety of the past 15-plus months, Defendants have indefinitely detained A.R.D.A. in a "secure" detention center,[2] the highest-security level of immigration detention available for children, failing to promptly reunify him with his adult maternal cousin, Mr. Nestor Rosales Dubon, who lives and works in [redacted], or place him in the "least restrictive setting that is in [his] best interests" as required by law. 8 U.S.C. § 1232(c)(2)(A).

3.     Defendants' continuing detention of A.R.D.A. is unlawful because Defendants have no authority to detain immigrant children for mental healthcare.

4.     Defendants have contributed to the traumatic, prolonged nature of A.R.D.A's detention by arbitrarily transferring A.R.D.A from one secure facility to another across the country, exacerbating A.R.D.A's mental health disability and delaying his immigration proceedings. A.R.D.A. has been in a "secure" detention facility since April 23, 2017, for over

---

[1] In compliance with Local Civil Rule 7(C) and Fed.R.Civ.P. 5.2, A.R.D.A., a minor, is identified only by his initials. A.R.D.A.'s full name is known to the Defendants/Defendants, and appears throughout the exhibits contemporaneously filed under seal pursuant to Local Civil Rule 5.

[2] Beginning when a child comes into ORR custody, the agency's online guide provides that ORR may place him or her in one of three levels of care based on an assessment of the level of security risk and harm to self or others that the child poses: (i) "shelter care" is the least restrictive custodial setting; (ii) "staff secure" is the intermediate level; and (iii) "secure" care is the most restrictive level. Children can also be placed in Residential Treatment Centers, given psychiatric or psychological issues, and in long-term or transitional foster care.

one year and three months, the near entirety of the time he has been detained but for two days when he was initially held at a shelter-level detention center. Ex. 1, Southwest Key Campbell Notice of Transfer.

5.      Defendants operate only three secure facilities nationwide: one in Woodlands, California, the Yolo County Detention Center ("Yolo"), where A.R.D.A. was detained for nearly seven months, and two facilities in Virginia: the Shenandoah Valley Juvenile Center ("Shenandoah") in Staunton, Virginia, and the Northern Virginia Juvenile Detention Center ("NOVA") in Alexandria, Virginia, where A.R.D.A. has remained detained for over eight months as of the date of this filing. Since being placed in these facilities, A.R.D.A. has [redacted]. *See* Ex. 2, Dr. Sheetal Patel, Ph.D., Forensic Psychological Evaluation, dated April 8 and May 6, 2018 ("Dr. Patel Psych Eval."). Now, that NOVA is endings its contract with Defendants to detain immigrant children on September 4, 2018[3], it is unclear what will happen to A.R.D.A. Defendants have failed to reunify A.R.D.A. to his family sponsor or detain him in a less restrictive setting. As a result, Defendants will likely transfer A.R.D.A. yet again, either back to Yolo or to Shenandoah, a facility currently under investigation on allegations of child abuse and use of excessive force.[4]

---

[3] *See* "Juvenile Detention Center in Virginia ends Contract with U.S. Government to imprison Immigrants", *available at:*
 https://www.virginiafirst.com/news/local-news/juvenile-detention-center-in-virginia-ends-contract-with-us-government-to-imprison-immigrants/1261791928 (last accessed July 5, 2018); "Virginia Juvenile Detention Center Ending Federal Contract," *available at*: https://www.washingtontimes.com/news/2018/jun/20/virginia-juvenile-detention-center-ending-federal-/ (last accessed July 5, 2018).
[4] *See* "Young immigrants detained in Virginia allege they were beaten while cuffed, left nude in cells", *available at:* https://www.cbsnews.com/news/shenandoah-valley-juvenile-center-virginia-young-immigrant-detainees-allege-beaten-stripped-of-clothes-strapped-to-chairs/ (last accessed July 5, 2018); "Handcuffs, assaults, and drugs called 'vitamins': Children allege grave abuse at migrant detention facilities", *available at:* https://www.cnn.com/2018/06/21/us/undocumented-migrant-children-detention-facilities-abuse-invs/index.html (last accessed July 5, 2018)

6.      Defendants have failed to provide adequate care or reasonable accommodations for A.R.D.A.'s mental illness, and instead have actively taken steps to restrict his mental healthcare. On the very day that A.R.D.A.'s prior counsel in California scheduled a psychological evaluation for A.R.D.A. to support his asylum case while detained in a secure facility in California, Defendants arbitrarily transferred A.R.D.A. across the country to another secure facility in Virginia without any notice to counsel or stated justification for the transfer. *See* Ex. 3, Email Communications from Legal Services for Children Regarding Transfer (November 14, 2017); Ex. 4, Declaration of Gloria Jimenez Moran, MSW, Legal Services for Children ("Jimenez Moran Decl."); Ex. 11, Notification of Transfer From Yolo to NOVA (November 7, 2017). When A.R.D.A.'s guardian ad litem [redacted], Defendants [redacted]. *See* Ex. 5, [redacted]. These acts have significantly hampered A.R.D.A.'s ability to participate in a federal program, his removal proceedings, and seek the protection afforded to him by the asylum statutes.

7.      Defendants are aware of A.R.D.A.'s worsening mental health. Defendants have [redacted]. Still, Defendants have kept A.R.D.A., a child improperly placed in a maximum-level secure facility suffering from a mental health disability, indefinitely detained with highly restricted movement.

8.      Defendants are in dereliction of their duties to incorporate child welfare values into the care and placement of A.R.D.A. and promptly place A.R.D.A. in the least restrictive setting that is in his best interest. A federal district court recently concluded that given "the deleterious impact (anxiety, depression, and/or cognitive change) of detention" for immigrant children, "[t]here is no dispute that the longer the detention, the greater the impact."[5]

---

[5] *L.V.M. v. Lloyd*, No. 18 CIV. 1453 (PAC), 2018 WL 3133965, *3 (S.D.N.Y. June 27, 2018).

4

Recognizing these harmful effects of detention for children and both the plight and vulnerability of those like A.R.D.A., Congress enacted a series of laws and Federal policies that have been put in place specifically to minimize the use of detention and offer important protection to these children. These laws and policies establish a preference for release over lengthy detention, and require, *inter alia*, that ORR promptly reunite children with loved ones in the United States while their immigration cases are adjudicated. But A.R.D.A. has been illegally and improperly denied reunification with his family-member sponsor and indefinitely detained in a secure facility as a result of his mental disability in direct contravention to these laws and policies.

9.     Indeed, under Defendant Scott Lloyd, whom President Trump appointed to head ORR, the agency responsible for the care of immigrant children like A.R.D.A., the process of reunifying immigrant children, particularly those in secure facilities, with a sponsor as required by statute has changed. Upon taking office[6] Defendant Lloyd altered agency policy and practice in mid-2017[7] such that any reunification cannot be approved – and thus children cannot be released from detention – if the child is currently (or has ever been) detained in a secure or staff secure facility, unless he personally reviews and approves them ("the Director Review Policy").[8] This Director Review Policy has contributed to A.R.D.A.'s prolonged detention.

10.     Plaintiff A.R.D.A. is typical of many children in the United States who have been adversely affected by Defendant Lloyd's new process for reviewing detention and reunification

---

[6] *Id*. at *20 (describing how Defendant Lloyd adopted the Director Review Policy "within hours of becoming the ORR director" and without reviewing any agency documents or assessing the impact on UAC).

[7] As reflected in the June 12, 2017 revision to the online ORR guide. *See L.V.M.,* No. 18 CIV. 1453 (PAC), 2018 WL 3133965, *6 n.5 (citing to ORR Guide; Children Entering the United States Unaccompanied, Office of Refugee Resettlement (Jan. 30, 2016, as revised on Jun. 12, 2017), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7).

[8] *See* Ex. 7, Office of Refugee Resettlement, ORR Guide: Children Entering the United States Unaccompanied, Sec. 2.7 (p. 35) (last accessed July 5, 2018); Statement of Defendant Lloyd before the Senate Judiciary Committee of June 21, 2017. *See* https://www.acf.hhs.gov/olab/resource/testimony-of-scott-lloyd-ms-13 (last accessed May 2, 2018).

of immigrant children. A.R.D.A. deserves the opportunity to live in a healthy, nurturing, and healing environment that his family-member sponsor, his maternal cousin, Mr. Rosales Dubon, is prepared to provide while awaiting adjudication of his immigration status and receiving appropriate home-based, therapeutic mental health behavioral services. A.R.D.A. is close with his cousin Mr. Rosales Dubon, who visits him every two to three weeks and regularly speaks to him by phone. *See* Ex. 6, Declaration of Nestor Rosales Dubon ("Rosales Dubon Decl.") ¶ 4. Mr. Rosales Dubon has taken all required steps to complete the sponsor reunification process, including completing a Family Reunification Packet, undergoing fingerprints for himself and every adult in his home, and a Home Study. *Id*. Placing A.R.D.A. with his cousin is in his best interests, and Defendants should not be permitted to delay this reunification any further.

11.     Given the specter of indefinite detention, A.R.D.A. now seeks the Court's intervention so that he can be released from secure detention to his cousin's care. He requests that the court order him released so that he will no longer be subjected to the grievous harms that he is suffering from living in isolation away from loving family and left to languish, imprisoned in government custody.

12.     No laws or policies permit Defendants to indefinitely detain a child for the purpose of his mental health disability. The Defendants' actions violate the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the federal statute that governs the detention and release of immigrant children), the Constitution's Due Process Clause of the Fifth Amendment, the Administrative Procedure Act's prohibition on unreasonable delays and arbitrary and capricious agency conduct, and Section 504 of the Rehabilitation Act and its implementing regulations.

6

13.     Defendants' actions have caused and are causing serious and irreparable harm to Plaintiffs A.R.D.A. and Mr. Rosales Dubon. A.R.D.A. therefore seeks habeas relief and Plaintiffs seek declaratory and injunctive relief from this Court to end these violations and harms.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 2241 (habeas corpus); and 28 U.S.C. § 1361 (mandamus).

15.     Venue is proper in the Alexandria Division of the Eastern District of Virginia under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred and continue to occur in this district. Venue is also proper under 28 U.S.C. § 2241(d) because A.R.D.A. is detained within this district.

## THE PARTIES

16.     Plaintiff A.R.D.A. is a 16-year-old boy from [redacted] who the defendants have detained for over one years and three months, since April 21, 2017.

17.     Plaintiff Mr. Rosales Dubon is A.R.D.A.'s cousin. He lives in [redacted]. Mr. Rosales Dubon has a close relationship with A.R.D.A. Mr. Rosales Dubon speaks to A.R.D.A. regularly by phone and visits him at the detention facility every two to three weeks.

18.     Defendant Scott Lloyd is the Director of the Office of Refugee Resettlement ("ORR"). ORR is the government entity directly responsible for the detention of A.R.D.A. Mr. Lloyd is a legal custodian of A.R.D.A. and is sued in his official capacity.

19.     Defendant Alex Azar is the Secretary of the Department of Health and Human Services, the department of which ORR is part. Mr. Azar is a legal custodian of A.R.D.A. and is sued in his official capacity.

20.     Defendant Steven Wagner is the Acting Assistant Secretary for the Administration for Children and Families under the U.S. Department of Health and Human Services. The Administration for Children and Families is the office within HHS that has responsibility for ORR. Mr. Wagner is a legal custodian of A.R.D.A. and is sued in his official capacity.

21.     Defendant Jonathan White is the Deputy Director of ORR. Mr. White is a legal custodian of A.R.D.A. and is sued in his official capacity.

22.     Defendant Natasha David is a Federal Field Specialist at ORR. Ms. David is a legal custodian of A.R.D.A. and is sued in her official capacity.

23.     Defendant Johnitha McNair is the Executive Director of Northern Virginia Juvenile Detention Center ("NOVA"), and is the warden of that facility. A.R.D.A. is currently held at NOVA. Ms. McNair is a legal custodian of A.R.D.A. and is sued in her official capacity.

## BACKGROUND AND LEGAL FRAMEWORK

### A.  Legal Framework and Policies Governing Custody and Release of Immigrant Children

24.     Each year, thousands of unaccompanied alien children ("UAC") arrive in the United States to escape persecution in foreign countries, some with relatives and some alone.[9] In recent years, the U.S. has seen an influx of children from Central America fleeing endemic levels of crime and violence that have made those countries extremely dangerous, especially for

---

[9] *See* Office of Refugee Resettlement: Facts and Data, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last accessed July 5, 2018).

children and young adults.[10]  In FY2017, 23% of UACs were from [redacted], as is Petitioner A.R.D.A.[11]

25.      The care and custody of UACs by the government is governed primarily by two statutes—6 U.S.C. § 279 and 8 U.S.C. § 1232.

26.      A 1997 binding settlement agreement in litigation in the Central District of California regulates the conduct of Respondents with respect to UACs in the custody of Respondents (the "*Flores* Agreement"). The *Flores* Agreement sets national standards for the detention, release, and treatment of immigrant children in Defendants' custody.[12]

27.      The *Flores* Agreement requires that Defendants release children "without unnecessary delay" during immigration proceedings and requires Defendants to undertake "prompt and continuous efforts" towards family reunification.[13] As the Fourth Circuit Court of Appeals explained, "[t]he *Flores* Agreement spells out a general policy favoring less restrictive placements of alien children (rather than more restrictive ones) and their release (rather than detention)." *D.B. v. Cardall*, 826 F.3d 721, 732 (4th Cir. 2016). Under the Agreement, "[U]nless detention is necessary to ensure a child's safety or his appearance in immigration court, he *must* be released without unnecessary delay, preferably to a parent or legal guardian." *Id.* (citing *Flores* Agreement ¶ 14) (emphasis added) (internal citations omitted).  The *Flores* consent decree also gives these children the right to a bond hearing before an immigration judge.[14]

---

[10] *See* ACF Fact Sheet, https://www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf (last accessed May 2, 2018).

[11] *See* Office of Refugee Resettlement: Facts and Data, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last accessed May 2, 2018).

[12] *See Flores, et al., v. Reno* Stipulated Settlement Agreement, *available at:* https://cliniclegal.org/sites/default/files/attachments/flores_v._reno_settlement_agreement_1.pdf (last accessed July 5, 2018).

[13] *Id*. at "VI. General Policy Favoring Release," 14, 18 and "Exhibit 2 Instructions to Service Officers re: Processing, Treatment, and Placement of Minors" (d).

[14] The *Flores* bond hearing **does not** empower an immigration judge to order a child's release from ORR custody or even to review the reunification process. It merely permits the immigration judge to determine whether a child is a

Moreover—and particularly salient in regards to A.R.D.A.'s mistreatment by ORR—"[t]he child may be detained in a secure facility [i.e., the most restrictive] only under specified limited circumstances, and then only when no less restrictive alternative is available and appropriate." *Id.*

28.     In 2002, Congress took further action to protect UACs when it passed the Homeland Security Act ("HSA") and transferred the care and custody of unaccompanied immigrant children from the Immigration and Naturalization Service ("INS") to the Office of Refugee Resettlement, housed within the Department of Health and Human Services ("HHS"). ORR is not a security agency; its mission is to "incorporate[e] child welfare values" into the care and placement of unaccompanied immigrant children.[15] Despite the reorganization mandated by the HSA, the *Flores* Agreement is binding on all successor agencies to the INS,[16] including ORR.[17]

29.     Building on *Flores* and the provisions of the HSA regarding immigrant children, Congress further passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), codified at 8 U.S.C. § 1232, which grants legal protections to children in ORR custody and tasks the agency with ensuring they are "promptly placed in the least restrictive setting that is in the best interest of the child." Senator Diane

---

danger to self or the community or a flight risk, thus substantiating or contradicting ORR's claims that it continues to have authority to detain a child. *See Flores v. Sessions*, 862 F.3d 863, 867-69 (9th Cir. 2017) ("Even if the immigration judge determines that the form of detention ORR has imposed is improper, the government must still identify a safe and secure placement into which the child can be released. As a result, a favorable finding in a hearing under Paragraph 24A does not entitle minors to release"). ORR remains the sole governmental entity with authority to release a child from its custody.

[15] https://www.acf.hhs.gov/orr/programs/ucs (last visited 7/3/2018).

[16] The HSA transferred functions of INS to several agencies within the newly-created Department of Homeland Security.

[17] The ORR recognizes its continuing obligations under the *Flores* Agreement. *See* Ex. 7, Office of Refugee Resettlement, ORR Guide: Children Entering the United States Unaccompanied, Sec. 3.3 (p. 46) (last accessed May 2, 2017) (outlining obligations imposed by *Flores* Agreement on ORR care provider facilities).

Feinstein, a sponsor of the bill that would become the TVPRA, explained that the legislation was intended to redress situations like one she had personally witnessed, where an unaccompanied child remained in custody for nine months after her initial detention. The text and legislative history of the TVPRA make clear that Congress enacted it to facilitate the speedy release and minimally restrictive placement of immigrant children.

30.     Again, as the Fourth Circuit observed, the TVPRA contained various provisions that mirror the *Flores* Agreement's focus on the welfare of the child. "[T]he Office shall promptly place a UAC in the *least restrictive* setting that is in the UAC's best interest, subject to the need to ensure the UAC's safety and timely appearance at immigration hearings." *Cardall*, 826 F.3d at 733 (citing 8 U.S.C. § 1232(c)(2)(A)). As important, "[t]he Office shall not place a UAC in a secure facility [e.g., NOVA] absent a determination that the UAC poses a danger to self or others or has been charged with having committed a criminal offense." *Id.*

31.     ORR has never promulgated regulations under the TVPRA. The only public guidance on ORR's detention and release procedures is a guide that has existed for at least a decade but was not published online until 2015.[18] ORR edits and amends this guide as often as once a week and does so without any explanation or announcement of the changes. ORR also regularly advises its staff and service providers of nonpublic changes to this guide by email or phone.

32.     Reviewing ORR's placement practices in 2016, a subcommittee of the Senate Committee on Homeland Security and Governmental Affairs found that ORR had "failed to adopt and maintain a regularized, transparent body of policies and procedures concerning the placement of UACs" and castigated the agency for what it called "[s]etting governmental policy

---

[18] *See id.*

on the fly" in a manner "inconsistent with the accountability and transparency that should be expected of every administrative agency."[19] And although it is crafted without the required public accountability and transparency over ORR's activities, the online guide does provide a set of procedures for the agency to follow when determining the placement and release of children in its care.

33.     These procedures are applicable to over 7,000 children in ORR custody nationwide. Four facilities in Virginia have contracts with HHS to house children in ORR custody, two of them being secure facilitates, including the NOVA secure facility where A.R.D.A. is currently held.

34.     ORR places children in secure or staff-secure settings (either initially upon entry into the ORR system or as the result of a "step up" once the child is already in ORR custody) for a variety of reasons, including disruptive behaviors, even those tied to mental health;[20] an expression of a desire to leave ORR custody, which can be construed as making the child an "escape risk"; and other disclosures of behaviors or thoughts deemed to raise safety concerns, including feelings expressed in confidence to mental health professionals or social workers contracted by ORR to care for children.[21]

35.     ORR's online guide also contains procedures governing the release of children in its care. The guide provides for ORR to "begin[] the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters

---

[19] *Flores*, 862 F.3d at 879 n. 18.
[20] ORR's ability to address mental-health linked behavioral issues in more therapeutic Residential Treatment Centers is limited because there are only two nationwide. *See* Ex. 7, Office of Refugee Resettlement, ORR Guide: Children Entering the United States Unaccompanied, Sec. 1.4.6 (p. 17).
[21] "Kids who cross the border meet with therapists and social workers. What they say can be used against them.", available at: https://www.vox.com/policy-and-politics/2018/6/18/17449150/family-separation-policy-immigration-dhs-orr-health-records-undocumented-kids (last accessed July 5, 2018); "For one teen asylum seeker, confessing fears led to months in detention", available at: https://www.cnn.com/2018/06/29/us/teenage-asylum-seeker-migrant-describes-months-in-detention-invs/index.html (last accessed July 5, 2018).

ORR's care." For children without a viable sponsor in the U.S., ORR has a long-term foster-care program through which children who have demonstrated "safe behavior in a non-secure setting" can be placed with families or in the community, rather than a shelter. ORR also has policies and procedures that "require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'" Once a custodian or sponsor has been identified, he or she must complete two forms—an authorization for release of information and a family reunification application—and provide documentation of the identity of the child, the sponsor's identity and address, his or her relationship to the child, and "evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan."

36.     Once an ORR care provider and a nongovernmental third-party reviewer, called a "case coordinator," "conclude[] that the release is safe and the sponsor can care for the physical and mental well-being of the child," the care provider "makes a recommendation for release" to the ORR Federal Field Specialist (FFS), an individual who acts as the local ORR liaison with the facility. Historically, the FFS then either approved or denied release or requested more information. Prior to 2017, children placed in staff-secure custody were typically released to a sponsor within 30 to 90 days.[22] For children in shelter care, the average length of time in custody was 34 days, after which time the vast majority were reunited with a sponsor. "Since the change in administration, however, the release of children in a secure or staff-secure facility no longer takes 90 days; it now takes seven to eight months on average."[23] But for children held in secure

---

[22] Some reports show that in 2012-13, the average days until release was 67 days for male children. *See* Report of the National Technical Assistance Center for the Education of Neglected or Delinquent Children and Youth on the Northern Virginia Detention Center, https://neglected- delinquent.ed.gov/sites/default/files/docs/NDTAC_1-pager-NVJDC_508.pdf (last accessed May 2, 2018).
[23] *L.V.M.*, No. 18 CIV. 1453 (PAC), 2018 WL 3133965 at *6, n.5

detention, many, like A.R.D.A., have been released even longer. As described below, new

changes—for reasons unexplained—to the long-standing policy of the FFS approving or denying

release were instituted by Defendant ORR Director Lloyd last spring and made public in June

2017, resulting in the reunification process coming to a virtual halt.

### B. Abrupt Unexplained and Arbitrary Changes to ORR's Policies and Procedures Under the Trump Administration

37.     The Trump administration has repeatedly engaged in rhetoric and policies that

demonize these vulnerable immigrant children and aim to subvert the laws intended to protect

them. Recent policy changes enacted by ORR reflect the Trump administration's rhetoric

vilifying immigrant children as dangerous criminals or gang members, unsupported

generalizations that have been routinely debunked by judicial findings.[24] The administration has

deployed this rhetoric despite the fact that ORR's own internal review has found that, even by its

own flawed identification process, fewer than two percent of children in its custody have gang

ties.[25]

38.     The Administration has taken particular aim at laws that protect immigrant

children. In his most recent State of the Union Address, President Trump described immigrant

---

[24] *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1199 (N.D. Cal. 2017) ("there is a serious risk that minors …
will—after rearrest on the basis of insufficiently substantial allegations of gang affiliation—erroneously be placed
into ORR custody, and without an opportunity obtain prompt relief. As the Ninth Circuit has recognized,
'[d]etermining whether an individual is an active gang member presents a considerable risk of error. The informal
structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the
assessment all heighten the need for careful factfinding.' *Vasquez v. Rackauckas*, 734 F.3d 1025, 1046 (9th Cir.
2013)…DHS sometimes makes an inference of gang membership from conduct, clothing, or associations that are far
from unequivocal evidence of that conclusion.")
[25] *See* Testimony from Scott Lloyd of June 21, 2017 to the Senate Judiciary Committee,
https://www.hhs.gov/about/agencies/asl/testimony/2017-06/statement-scott-lloyd-ms-13- problem.html (last
accessed May 2, 2018).

14

children as violent gang members who "took advantage of glaring loopholes in our laws to enter the country as unaccompanied alien minors."[26]

39.     In a rally held in Long Island in July 2017, President Trump declared that the "laws are so horrendously stacked against us" and called out "alien minors" as responsible for gang-related killings in the United States, referring to immigrant children accused of being gang members as "animals." "They're going to jails," he yelled, "and then they're going back to their country."[27]

40.     Attorney General Sessions has also furthered this narrative, alleging that certain immigrant children who come to this country are "wolves in sheep clothing."[28] In an interview with Fox News broadcast on August 3, 2017, Sessions said: "[W]e need to be able to deport people rapidly who enter the country illegally, and we have to end this policy of taking unaccompanied minors . . . and turning them over to the Department of Health and Human Services [the agency within which ORR is located], and then they take them to their 'destination city' . . . So this is a very bad and dangerous policy and it can be ended and it must be ended." On February 15, 2017, the Department of Homeland Security released a statement describing the *Flores* settlement and the TVPRA as "loopholes" that invite illegal immigration and fuel gangs.[29]

---

[26] President Donald J. Trump's State of the Union Address, Issued on January 30, 2018, https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-state-union-address/ (last accessed May 2, 2018).
[27] Remarks by President Trump to Law Enforcement Officials on MS-13, Issued on July 28, 2017, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-law- enforcement-officials-ms-13/ (last accessed May 2, 2018).
[28] Remarks by Attorney General Sessions to Federal Law Enforcement in Boston, Delivered September 21, 2017, https://www.justice.gov/opa/speech/attorney-general-sessions- gives-remarks-federal-law-enforcement-boston-about (last accessed May 2, 2018).
[29] "Unaccompanied Alien Children and Family Units Are Flooding the Border Because of Catch and Release Loopholes", *available at*:  https://www.dhs.gov/news/2018/02/15/unaccompanied-alien  children-and-family-units-are-flooding-border-because-catch-and (last accessed July 5, 2018).

41. Beyond publicly denouncing the existing and binding laws that protect these immigrant children, the Trump administration has called on Congress to amend the TVPRA and to strip children of many of the protections they are afforded under this legislation. Yet, unless those laws are amended or repealed, the Constitution requires that the Executive Branch follow the laws, not try to unilaterally rewrite them through unlawful action (or inaction). Though the TVPRA remains fully in place, the Trump Administration has actively worked to subvert its requirements in furtherance of its rhetoric portraying immigrant children as dangerous criminals and gang members. One such new policy ORR instituted under Defendant Lloyd's leadership was to place all children with gang allegations in "secure"—the most restrictive of detention centers—care, under the guise that they have "gang ties."[30] But the gang allegations upon which the agency relies on in making these placements have been debunked by virtually everyone who has reviewed them, both inside and outside ORR.[31]

42. For example, in late 2017 in the case *Saravia v. Sessions*, a federal district court in California ordered that immigrant children previously released from ORR custody as unaccompanied minors, subsequently detained for alleged gang involvement and placed back in ORR custody receive hearings before immigration judges to determine if they truly pose a danger.[32] On information and belief, in nearly every hearing in 2017 (27 of 29), immigration judges found the government's claim of dangerousness unfounded and ordered the child's release. But children like A.R.D.A., who are not class members in the *Saravia* case, still do not

---

[30] *See* Testimony from Scott Lloyd of June 21, 2017 to the Senate Judiciary Committee, https://www.hhs.gov/about/agencies/asl/testimony/2017-06/statement-scott-lloyd-ms-13- problem.html (last accessed May 2, 2018).
[31] *See supra* n.24.
[32] *See id*.

have any mechanism available to challenge their detention, even after they are stepped down from secure custody.

43.     Upon taking office, Defendant Lloyd instituted a new policy that indefinitely stalls the reunification of children like A.R.D.A. with qualified sponsors, like A.R.D.A.'s cousin. That policy—reflected in a revision to the online ORR guide on June 12, 2017—imposed a new and unprecedented requirement for the release of children who are currently or have ever been held in secure or staff-secure facilities within ORR: personal approval by Defendant Lloyd, or his designee, Defendant White. Defendant Lloyd, the same individual who instituted a policy in March 2017 to forbid detained pregnant immigrant minors from having abortions without his personal approval,[33] is not a social worker, psychologist, or educator. He has no experience or credentials that render him capable of making determinations for release and matters affecting the mental and physical well-being of these children. Before being appointed as ORR director in March 2017—a political appointment that does not require Senate approval or any particular expertise or qualifications—Defendant Lloyd was an attorney for the Knights of Columbus and served on the board of a crisis pregnancy center in Virginia. Yet nearly all of the requests for release elevated to senior ORR leadership for approval, including A.R.D.A.'s case, have been personally decided by Defendant Lloyd. The result is that after a child's release is recommended by someone who is actually trained and qualified to make that determination—e.g., shelter staff; a third-party case coordinator; a home-study worker, if applicable; and the FFS—supported by voluminous accompanying documentation, that request has been forwarded to Washington D.C., where it has languished with Defendants Lloyd and White, often for months or indefinitely. While there is a recent preliminary injunction enjoining Defendant Lloyd's director review

---

[33] *See Garza v. Hargan*, 304 F. Supp. 3d 145 (D.D.C. 2018).

policy at this time,[34] A.R.D.A.'s reunification application had been already subject to Defendant

Lloyd's Director Review Policy. Even if A.R.D.A.'s application is no longer subject to the

Director Review Policy at this time, it is unclear how the outcome of the reunification decision in

his case will change, as Defendants can easily continue to delay or deny children's reunifications

without warrant under the purview of the decision making of Defendant Lloyd's employees.

44.     Moreover, where ORR is unable to show that continued detention is necessary to

ensure a child's safety or his appearance in immigration court per the *Flores* agreement, and

therefore must immediately release the child, the need for personal review by Defendants Lloyd

or White has served the Trump administration's goals of denying justice to children who ORR

was specifically designed to protect. ORR's approach is rife with imperilments for due process,

especially in view of the *Mathews* factors. *See Mathews v. Eldridge*, 424 U.S. 319 (1976);

*Beltran v. Cardall*, 222 F. Supp. 3d. 476 (E.D.Va. 2016); *Santos v. Smith*, 260 F. Supp. 3d. 598

(W.D.Va. 2017). A.R.D.A.'s right to reunification under the enabling statutes that govern ORR

is affected by the actions of Defendants Lloyd and White, and the risk of deprivation of this right

is inconceivably high given the dilatory tactics employed by ORR and the Trump

Administration. And the government lacks any competing interest: ORR's mandate under the

statute and under the *Flores* agreement is family reunification.

45.     Since Defendants imposed this new arbitrary requirement of director approval for

release, the release of children who are or have previously been in secure or staff-secure

confinement has virtually grounded to a halt. Prior to 2017, children in staff-secure custody

typically remained detained for 30 to 90 days. Yet in the past 18 months, it has become rare for

children who require Defendant Lloyd's approval to be released at all (other than children

---

[34] *L.V.M. v. Lloyd*, No. 18 CIV. 1453 (PAC), 2018 WL 3133965 (S.D.N.Y. June 27, 2018).

ordered to be released as a result of litigation like the *Saravia* case in California). Many of these children either have turned 18 and were transferred to ICE custody or remain in ORR custody today. On information and belief, since January 2018, at the two secure facilities in Virginia, there has been only one reunification. A.R.D.A. should not be required to remain in ORR custody until he ages out at 18 on March 26, 2020, as by then he would have been imprisoned for nearly three years, well beyond any reasonable span of time for ORR to act on its mandate.

46.    In nearly every case, once ORR finally "acts" on a release recommendation, it is only to request yet even more "additional" information, services, or evaluations from care providers. The requests from ORR, either pursuant to the Director Review Policy or by other officials since it has been enjoined, are unguided by any policy or fixed set of criteria and amount to constantly moving targets that serve only to perpetuate the children's imprisonment indefinitely. In many cases, the care providers, who have already completed the full panoply of release procedures, believe these further requests or requirements are unnecessary and in some cases even harmful. Once care providers collect and relay the "additional" information that ORR wants, the children again have to wait lengthy periods and go through another cycle for yet another response, which likely is not release. In a statement to the Senate, Defendant Wagner states that ORR policy changes in March 2016 led to an increase in discretionary home studies (not required by the TVPRA).[35] These arbitrary requirements to correct ORR's own shortcomings unjustly punish children like A.R.D.A.

47.    The requirement of Director-level review has also unlawfully slowed other stages in the reunification process. For instance, case managers for children like A.R.D.A. in ORR

---

[35] Statement of Steven Wagner before the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, United States Senate, April 26, 2018, https://www.hsgac.senate.gov/imo/media/doc/Wagner%20Testimony.pdf (last accessed May 2, 2018)

custody substantially delay forwarding release recommendations because they believe, given their experience with this new level of review, that they may need to collect information that is otherwise extraneous to the ultimate decision or even harmful to the child or may need to await developments (like *Flores* bond hearings) that should not otherwise delay the reunification process. This slowing process is the direct result of case managers trying to adjust to and potentially combat, but to no avail, the stonewalling of the release of these children. This is unfortunately the situation in A.R.D.A.'s case specifically.

48.    Similarly, the step-down of children from secure care or staff-secure care to the less restrictive shelter care, often an essential precursor to release, has also slowed dramatically. Particularly for children *alleged* to have gang or criminal involvement, transfer to a less restrictive form of care often takes months longer than care providers believe necessary. This is true even if shelter care staff or an immigration judge have already rejected the gang allegations against a particular child. On information and belief, this delay in step-down is also the result of politically-motivated policies or practices put in place by ORR's leadership in an effort to undermine the TVPRA statute and *Flores* consent decree requirements, as confirmed by President Trump's June 20, 2017 Executive Order calling for the curtailment of the *Flores* Agreement.[36]

49.    For children, the devastating effect of these delays can include depression, deterioration in mental health, and behavioral problems associated with prolonged detention. Children like A.R.D.A. feel a sense of hopelessness stemming from their indefinite detention, particularly once they know that the ORR staff members or field professionals with whom they

---

[36] *See* "Affording Congress an Opportunity to Address Family Separation," Sec. 3(e) https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/ (last accessed July 5, 2018).

have had contact continually provide positive recommendations on their performance and progress, as staff have done for A.D.R.A., and yet they remain detained in a highly restrictive environment. Discouragement becomes despair, and in some cases, children respond by misbehaving in ways that cause them to face progressively more restrictions on their movement in custody, exacerbating their already significant depression and hopelessness. In other cases, children who fear persecution in their home countries nonetheless opt to accept removal and return there, rather than endure further detention, which for all intents and purposes resembles imprisonment in their view.[37] The indefinite wait times for these special new release approvals from ORR also render release plans and post-release services put in place by shelter staff obsolete, as the availability of those resources is often time-limited.

### C. Lack of Reasoned Explanation or Justification for Change in Procedures and Resulting Unlawful Delay in Violation of Statute

50.     ORR's online guide gave no explanation for the Defendant Lloyd's policy that he or his designee personally approve the release of all children currently or formerly in placements with heightened security, nor any information about the criteria used by the director or his designee or a timeline for completion of their review. As such, by definition, this practice is both arbitrary and capricious, and on information and belief, motivated solely by factors divorced from carrying out the mandate of the statute and judicial laws governing detention and release of UACs by ORR.

51.     To the extent that ORR has offered any public explanation for this policy, those explanations have—like statements by the President and Attorney General—focused entirely on

---

[37] It is unlawful for detention to be used as a deterrent, and doing so unlawfully incentivizes children with meritorious claims to self-deport due to detention fatigue. *See Damus v. Nielsen*, No. 18-578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) (granting preliminary injunction prohibiting ICE Field Offices from detaining asylum-seekers absent an individualized determination that they present a flight risk or danger to the community and from denying parole categorically).

the specter of allegedly gang-affiliated youth, with generalized rhetoric intended to stir unfounded fear and xenophobia. In Congressional testimony provided in June 2017, Defendant Lloyd stated that because of gang concerns and the Administration's prioritization of safety, he had instituted "major policy changes" with a goal of ensuring that children "needing heightened supervision or that present a danger to other UAC[s] are appropriately placed," particularly those alleged to have admitted gang involvement. As part of this process, he explained, "[s]enior ORR leadership now reviews all releases from secure and staff-secure facilities, and I make the final release decision."  He explained, in justifying this change, that he views "homeland security and juvenile justice" as areas within ORR's "mission." Defendant Lloyd's words espouse an intent to make up laws by the Executive Branch, and is a far cry from the "**child welfare values**" intended by the statutes and laws that actually govern ORR's treatment of children in its care.

52. Contrary to Defendant Lloyd's testimony suggesting that only those children currently in secure or staff- security facilities were subject to his review, the requirement for director approval has applied not only to those children but also to children who have ever been placed in those facilities, even if they had been subsequently stepped down to shelter care because qualified professionals (e.g., case managers) within ORR itself has recognized they pose no threat.

53. In August 2017, ORR sent an "Information Memo" to the President's Domestic Policy Council regarding its "Community Safety Initiative for the Unaccompanied Alien Children [UAC] Program." The memo asserts that a review in June found a quarter of children in secure or staff-secure custody were "involved with gangs" and that, as a result, ORR has instituted a new requirement that Defendants Lloyd or White now "review and approve releases from secure or staff secure facilities."

54.     In addition to its inaccurate statement of current policy, the August 2017 memo

fails to offer any explanation of how ORR's "review" was conducted; what criteria were used to

establish gang involvement; and what steps if any were taken to verify the underlying

allegations, which—when the District Court injunction in the California case was issued months

later—immigration judges rejected as to dozens of children whom ORR had labeled as being

"gang-involved." The memo also offers no explanation for how review of a release

recommendation by Defendants Lloyd or White will supplement or differ from the review by the

numerous local officials whose release recommendations already include an assessment of

dangerousness—determinations that were previously deemed adequate before the "new

policies." Finally, the memo fails to acknowledge or address the impact of the Director-level

review requirement on the large number of children currently or previously in secure or staff-

secure custody who, by ORR's own estimation, have no alleged gang involvement. For instance,

in December 2017, the New York Civil Liberties Union (NYCLU) challenged the four-year-long

detention of a 15-year old boy, J.M.R.M., whose release from ORR was stalled because he had

spent time in a staff-secure facility a year and a half earlier; his placement there was the result of

behavioral issues that stemmed from poorly managed mental health and past trauma. Shortly

after the NYCLU filed its lawsuit, ORR released him. In addition, in May 2018, the Legal Aid

Justice Center (LAJC) challenged the eight-month-long detention of a 17-year old boy, O.D.T.M,

whose release from ORR custody in a secure facility did not occur because of delays in a

decision of his sponsor uncle's home study application. Shortly after the LAJC filed its lawsuit,

ORR released him.

55.     In May 2017, as a result of litigation ordering ORR to release a child because it

had failed to reunify the child with his mother, *see Santos v. Smith*, 260 F. Supp. 3d 598 (W.D.

Va. 2017), ORR's online policy guide was amended to provide for the possibility of an "appeal" to the Assistant Secretary of ORR if a reunification request is denied. But this process—at which sponsors have no right to call witnesses, includes no requirement of a reasoned decision, and uses a politically-appointed official as an adjudicator—is available only once a final decision is rendered on a reunification request. Setting aside the other fatal procedural flaws, this appeal process also fails because, given current ORR practice, very few cases will be ripe given the indefinite delays in arriving at a decision on reunification, as is evident in the specific case of A.R.D.A.

## FACTUAL ALLEGATIONS AND ACTS PERTAINING TO A.R.D.A.

### A. A.R.D.A.'s Persecution in His Home Country of Honduras and Arrival in the United States

56.     A.R.D.A. is a 16-year-old citizen of [redacted]who was born on [redacted] and came to the U.S. on or about April 20, 2017. He fled [redacted] to escape horrific persecution, including life-threatening child abuse. A.R.D.A.'s father passed away when he was six or seven years-old after a battle with cancer. After his father's death, A.R.D.A. suffered from severe physical and emotional abuse at the hands of his mother and stepfather. His mother would [redacted]. One time when A.R.D.A. tried to cover himself from being hit [redacted] *See* Ex. 8, Yolo Security Facility Clinician Notes (May 15, 2017). While A.R.D.A. endured abuse, no one protected him or provided him with emotional support. A.R.D.A.'s mother kicked him out when he was seven years-old. Disclosing this past trauma is re-traumatizing and triggering for A.R.D.A. *See* Ex. 4, Jimenez Moran Decl. ¶ 3.c.

57.     A.R.D.A. has never been arrested or charged with a crime. Prior fleeing to the United States at the age of 16, he worked hard in the fields from ages eight to ten, while living in

24

friends' homes. Homeless and abandoned, A.R.D.A. was recruited by a gang. Subsequently,

twelve members of a rival gang shot at him for joining the other gang, beat one of his friends,

and then told A.R.D.A. they would kill him and his mother if he did not leave [redacted].

58.     At age 14, A.R.D.A. fled [redacted]. While traveling to the United States,

A.R.D.A. lived in [redacted]for one year, where he was hospitalized for psychiatric treatment.

While in [redacted], a man told A.R.D.A. he would get him to the U.S. safely if A.R.D.A.

worked for him. The man told A.R.D.A. he had to guide people across the border fives times and

then would be permitted to cross himself on the sixth time. A.R.D.A. felt forced. After the first

two crossings, A.R.D.A. did not want to do any more and, on April 20, 2017, he turned himself

into Customs and Border Patrol.


**B. A.R.D.A.'s Traumatic Prolonged and Unexplained Detention by ORR, Including His Arbitrary Transfer and Assault by Guards**

59.     Since April 24, 2017, for over one year and three months, A.R.D.A. has been

detained in the most restrictive, high-level of security facility, and since November 7, 2017,

detained at one of these secure facilities here in Virginia.

60.     On April 21, 2017 CBP Officer Ricardo Biseno issued A.R.D.A. a Notice to

Appear in removal proceedings by. Ex. 9, Notice to Appear. Also on April 21, 2017, A.R.D.A.

was taken to and placed in an unaccompanied children's shelter in Phoenix, Arizona operated by

Southwest Key Programs ("Southwest Key Campbell"). Ex. 10, ORR Placement Authorization

for Southwest Key Campbell.

61.     On April 22, 2017, one day after A.R.D.A. had been detained and placed at a

low-level shelter facility, Case Manager Mariela Martinez requested that A.R.D.A. be

transferred to the secure facility at the Yolo County Detention Center ("Yolo") in California.

She stated the reasons for her transfer request by checking the boxes [redacted]. <u>Ex. 1</u>, Southwest Key Campbell Notice of Transfer. Also on the form, a box was checked stating he has "non-diagnosed behavior/Illness with no medication." *Id*. ORR approved this request the same day. *Id*.

62.     From April 23, 2017 until November 7, 2017, ORR detained A.R.D.A. at Yolo. While detained at Yolo, A.R.D.A developed a strong, trusting relationship with his *pro bono* attorney, who was part of a legal service provider in California, Legal Services for Children. Sometime after April 2017, the attorney entered an appearance in immigration court and filed an affirmative asylum application for A.R.D.A. with the San Francisco Asylum Office. As part of the representation, the attorney scheduled an external psychological evaluation to address his past mental health issues and develop key evidence for his asylum case. *See* <u>Ex. 4</u>, Jimenez Moran Decl. ¶ 3.h.

63.     On November 7, 2017, the day that A.R.D.A. was scheduled for the psychological evaluation arranged by counsel, ORR arbitrarily and laterally transferred A.R.D.A. from the secure facility Yolo to another secure facility across the country, the Northern Virginia Juvenile Detention Center ("NOVA") in Alexandria, Virginia.  <u>Ex. 4</u>, Jimenez Moran Decl. ¶ 3.f., 3.h. (noting A.R.D.A.'s discharge notification showed he was released from Yolo at 1:50PM and that A.R.D.A.'s attorney, who was at the facility by 9:42AM, was told A.R.D.A. was already on his way to Virginia); <u>Ex. 3</u>, Email Communications from Legal Services for Children Regarding Transfer (November 14, 2017). There is no documentation in A.R.D.A.'s ORR file providing a reason for the transfer; the only document in his ORR file is a discharge notice from November 7, 2017. *See* <u>Ex. 11</u>, Notification of Transfer From Yolo to NOVA (November 7, 2017). Despite the transfer having been approved four days prior, A.R.D.A.'s

attorney, at the time, did not receive any notice or explanation for A.R.D.A.'s transfer, especially, on the day of his psychological evaluation. Ex. 4, Jimenez Moran Decl. ¶ 3.h. Given that A.R.D.A. was already detained in a secure facility, his transfer was unexpected.  *See id.* As a result, A.R.D.A. lost access to his *pro bono* counsel he had acquired a rare level of trust and comfort with given his history of abuse, abandonment, neglect, and mental health struggles.  *See id.* ¶ 3.c.

64.     A.R.D.A. has remained in the ORR secure facility NOVA ever since. Like at Yolo, the conditions of the high security NOVA facility severely limit A.R.D.A.'s movement within the facility, and his time to socially interact, play, and learn with his peers or on his own. Defendants have placed A.R.D.A. in highly restrictive settings including a "four-foot restriction", meaning there have been periods when a guard has been required to be in the room with him at all times less than four feet away including when he is meeting with his attorneys, impending confidential communications and making it difficult for him to establish a new relationship with new counsel.

65.     The conditions A.R.D.A. has been subjected to while under Defendants' care have led to several Significant Incident Reports ("SIRs"). Many of these relate to A.R.D.A.'s detailing of his life back in [redacted ]including the severe physical abuse and traumas he suffered, and behaviors related to his mental health disability, rather than any incidents that took place in the facilities themselves. Several SIRs mention [redacted]. *See* Ex. 2, Dr. Patel Psych. Eval. at 6. As an example, one SIR was issued on July 24, 2018 [redacted]. Ex. 12, Significant Incident Report (July 24, 2018).

66.     In some cases, the response by facility staff escalate these incidents in that the punishment is excessive in comparison to the original activity. For example, on October 13,

2017, staff put A.R.D.A. in an escort hold after an incident that began with him horse playing, throwing candy in the air, and then being unreceptive to a guard directing him to stop and sit down. *See* <u>Ex. 13</u> Significant Incident Report (October 13, 2017).

67.      Several SIRs were issued for activity that is otherwise expected of a child with a mental health disability facing prolonged detention in a highly restrictive setting. For example, an SIR was issued for A.R.D.A. on December 2, 2017 after another child allegedly made a physical gesture at a case manager because A.R.D.A. "started to yell" at the case manager: "I am a witness and he did nothing! Why don't you leave us the hell alone!". *See* <u>Ex. 14</u> Significant Incident Report (Dec. 2, 2017). For someone who is suffering trauma-related PTSD like A.R.D.A., these responses of "'fight or flight' are universal trauma responses to perceived threat" and may be "reflective of a trauma response where he felt unsafe." *See* <u>Ex. 2</u>, Dr. Patel Psych. Eval. at 6. As described by licensed social worker who worked with A.R.D.A. at Yolo, A.R.D.A.'s hyper-vigilance is a survival mechanism from having to always be aware of his surroundings to stay safe. *See* <u>Ex. 4</u>, Jimenez Moran Decl. ¶ 3.d.

68.      In another incident that occurred while detained at Yolo, A.R.D.A. was charged with [redacted], which the California juvenile court dismissed in the interest of justice because the offense was related to a mental health disability and not an intentional or willful act. *See* <u>Ex. 15</u>, Superior Court of California Juvenile Court Order dismissing charge based on mental health (Oct. 3, 2017). The constant re-traumatization that A.R.D.A. faces in a maximum security facility causes him to "feel unsafe and at risk" and "perpetuates survival mode", while his triggers "often manifest in ways that are viewed as problematic by the detention facility guidelines which do not nurture [A.R.D.A.]'s needs and instead isolate him as a form of punishment." *See* <u>Ex. 4</u>, Jimenez Moran Decl. ¶ 3.c, 3.f.

69.     On information and belief, there have also been at least three occasions in which

A.R.D.A. suffered [redacted]. While A.R.D.A. was detained at Yolo, [redacted]. *See* Ex. 16,

Suspected Child Abuse Report (Sept. 6, 2017). In approximately January or February 2018,

A.R.D.A. had [redacted].  In July 2018, [redacted].

70.     These examples demonstrate the inappropriate environment that a maximum

security detention center is for a child like A.R.D.A. who is suffering from a mental health

disability, and the lack or inadequate care provided by the staff for a minor with specific needs.

### C.  A.R.D.A.'s Cousin Mr. Rosales Dubon and A.R.D.A.'s Attempts to Reunite, and ORR's Failure to Respond Leading to this Case

71.     A.R.D.A. has a maternal cousin, Mr. Rosales Dubon, who he has known since he

was born. Mr. Rosales Dubon resides and works in [redacted], and applied to be A.R.D.A.'s

sponsor and physical custodian after A.R.D.A. was transferred to NOVA in Virginia in

approximately November or December 2017. *See* Ex. 6, Rosales Dubon Decl. Since his

application, Mr. Rosales Dubon has complied with every requirement ORR has made to evaluate

his suitability to serve as A.R.D.A.'s sponsor. *Id*.

72.     A.R.D.A. and his cousin have a close relationship, despite being geographically

separated for most of A.R.D.A.'s life. *Id*. ¶ 4. Mr. Rosales Dubon and A.R.D.A. have spoken

regularly and in person since A.R.D.A.'s detention began. *Id*.; Ex. 27, Young Center for

Immigrant Children's Rights Best Interests Recommendation ("Young Center BIR") at 2. Mr.

Rosales Dubon visits A.R.D.A. at the NOVA secure facility every two to three weeks. Ex. 6,

Rosales Dubon Decl. ¶ 4. Mr. Rosales Dubon provided his fingerprints in approximately January

or February 2018 and has done everything asked of him by the government, including

completing and signing every form sent to him by case workers at ORR, completing an

Application for Family Reunification, and accommodating a Home Study in April 2018. *Id*. ¶ 6-

9. Mr. Rosales Dubon wants to care for A.R.D.A. and help him get the mental health services he needs. *Id.* ¶ 5-6; Ex. 27, Young Center BIR at 2 ("Mr. Rosales Dubon could provide a stable home and has shown a genuine interest in [A.R.D.A.]'s wellbeing, and a willingness to ensure that [A.R.D.A.] receives the mental health treatment that he requires.").

73.    On information and belief, ORR concluded that Mr. Rosales Dubon's April 2018 Home Study positively demonstrated Mr. Rosales Dubon's ability to care for and supervise A.R.D.A. *Id.* (stating the April 2018 Home Study "noted that Mr. Rosales Dubon appeared financially and emotionally equipped to take care of [A.R.D.A.]."). On information and belief, the government contractor who conducted the Home Study provided good marks for Mr. Rosales Dubon after determining that Mr. Rosales Dubon can provide a good and safe home, knows about the services available in his community for A.R.D.A., and sought out recommendations from the ORR-contracted clinician as to what services A.R.D.A. needs, including an involved conversation with the clinician to better understand A.R.D.A.'s mental health needs. Ex. 6, Rosales Dubon Decl. ¶ 9.

74.    After the Home Study was conducted and A.R.D.A. spoke to the Home Study conductor himself, it had been A.R.D.A.'s belief that Mr. Rosales Dubon would now pass the Home Study. With the hope that he would soon be reunified with his cousin and released from detention, A.R.D.A. showed his potential for good behavior. On April 27, 2018, the same month that the Home Study was conducted, A.R.D.A. was chosen to be the "Student of the Week for Overall Outstanding Academic Achievement." *See* Ex. 17, NOVA School Certificates at 1 (Alexandria City Public Schools Student of the Week Certificate). Nine staff members at the NOVA facility also provided A.R.D.A. with letters of recommendations, remaking on the positive changes he has made. *See* Ex. 18, NOVA Letters of Recommendation. In June 2018,

A.R.D.A. received an excellent report card including "A" grades in English, Math, Science, Social Studies, and Physical Education and "Outstanding" marks for all but one of his classes in his last quarter of schooling. *See* Ex. 19, NOVA Grades (Northern Virginia Juvenile Detention Center School Student Progress Report, dated June 2018, and Education Program Grading Period Summary, dated June 2018).

75.     However, despite this positive April 2018 Home Study, A.R.D.A. received a negative recommendation for reunification from ORR because of his mental health. *See* Ex. 27, Young Center BIR at 2 ("The home study's negative determination and recommendations focused on [A.R.D.A.]'s mental health"). Notwithstanding having a sponsor who is willing and able to provide appropriate mental health care, A.R.D.A. remains waiting for a decision on reunification. The decision on Mr. Rosales Dubon's application for A.R.D.A. has been pending review by Defendant Natasha David, ORR Federal Field Specialist, and Defendant ORR supervisors. Approximately eight months having passed since Mr. Rosales Dubon submitted a reunification application on behalf of A.R.D.A., and approximately three months having passed since the home study, yet Mr. Rosales Dubon's sponsorship application still has not been decided.

### D.  A.R.D.A.'s Deteriorating Mental Health and Defendants' Failure to Provide Adequate Care

76.     A.R.D.A. suffers from a mental health disability. A licensed psychologist who conducted an evaluation of A.R.D.A. diagnosed him with [redacted]. *See* Ex. 2, Dr. Patel Psych Eval. Additionally, he has been diagnosed with [redacted].[38] A.R.D.A. has been prescribed [redacted].[39]

---

[38] *See* Ex. 20, [redacted] Diagnoses and Discharge Information (March 10-19 2018).
[39] Ex. 23, ORR File California Forensic Medical Group Incorporated Progress Notes, June 30, 2017; Ex. 20, Commonwealth Center for Children & Adolescents Diagnoses and Discharge Information (March 10-19 2018).

77.     A licensed social worker who worked with A.R.D.A. at Yolo stated: "From a mental health perspective, I am highly concerned of [A.R.D.A.]'s wellbeing and mental health…[A.R.D.A.]'s current and previous placements…do not provide the treatment and resources [A.R.D.A.] is in need of. This can and will have long term consequences . . . [A.R.D.A.]'s current placement in not a therapeutic placement, and instead a punitive setting which exacerbates Anuar's mental health, and would reasonably exacerbate any individual's mental health status especially a child with past trauma. " Ex. 4, Jimenez Moran Decl. ¶ 3.g. A.R.D.A.'s federally appointed Child Advocate at the Young Center for Immigrant Children's Rights has also acknowledged that A.R.D.A.'s mental health needs cannot be adequately met in the context of secure detention, where he has no access to specialized outpatient individual trauma-focused therapy. See Ex. 27, Young Center BIR at 2.

78.     Defendants are fully aware of A.R.D.A's worsening mental health disability and psychological harm. Given A.R.D.A.'s serious mental health struggles, an ORR-conducted psychological evaluator stated, "I have determined it is not medically safe to detain and incarcerate the arrestee". Ex. 24, Physician Psychological Assessment (May 19, 2017). Furthermore, on information and belief, on at least two occasions, Defendants have recognized A.R.D.A.'s mental health needs cannot be served in the context of a secure facility and have committed A.R.D.A. to a state hospital on an emergency basis. First, on March 9, 2018, Defendants requested that [redacted] to seek proper psychiatric care for A.R.D.A. outside of ORR detention through the state child welfare system. On March 9, 2018, the state family court granted that petition, involuntarily committing A.R.D.A. to [redacted].[40] A.R.D.A.'s attorney

---

[40] See Ex. 21, [redacted] Juvenile and Domestic Relations District Court Record of Proceeding and Court Order (March 9, 2018); See Ex. 20, [redacted] Diagnoses and Discharge Information (March 10-19 2018).

was not notified or present during this hearing. Second, on July 24, 2018, Defendants

hospitalized A.R.D.A. due to [redacted]. Ex. 12, Significant Incident Report (July 24, 2018). On

information and belief, Defendants hospitalized A.R.D.A. again later that same day. These

hospitalizations have been short-term in nature on emergency bases and insufficient to address

A.R.D.A.'s mental health disability.

79.     Despite ORR's own evaluator recognizing it is not in the best interests of

A.R.D.A. to be detained, Ex. 24, and Defendants' multiple efforts to commit A.R.D.A. at a

hospital for his mental health needs, Defendants have failed to provide adequate care for

A.R.D.A.'s mental illness. Instead, Defendants have challenged requests by his Guardian Ad

Litem to receive appropriate mental healthcare. In May 2018, A.R.D.A.'s Guardian Ad Litem

filed a [redacted] to seek proper in-patient mental health services and out-patient dental care for

him that NOVA is not equipped to provide. At a May 4, 2018 hearing, an Assistant United States

Attorney appeared representing Defendants, who argued that the [redacted] family court did not

have jurisdiction over A.R.D.A. because he is in ORR custody. The [redacted] Court then denied

the petition.[41] Defendants have also exacerbated A.R.D.A.'s mental health disability by

indefinitely detaining A.R.D.A., abruptly and arbitrarily transferring him from detention center

to detention center around the country, and failing to reunify him with his family-member

sponsor.

80.     Defendants' actions are not only causing short-term trauma but are likely to have

long-term effects on A.R.D.A. "Children who experience trauma are particularly vulnerable to

having the trauma effect their brain development and nervous system." See Ex. 2, Dr. Patel

Psych Eval. Childhood trauma carries a dramatically increased risk of long-term psychiatric

---

[41] See Ex. 5, [redacted] Juvenile and Domestic Relations District Court Record of Proceeding and Court Order
(May 4, 2018).

illness, including major depressive disorder, and anxiety disorders. Children who have suffered

from trauma are also at significantly increased risk of physical illness. As described by Dr. Patel,

a psychologist who evaluated A.R.D.A., "[A.R.D.A.]'s current living conditions are not 'home',

as they are not stable and does not provide a deep sense of security and safety, and he

experiences threats from other inmates. The lack of home and the threats at his current 'home'

that he experiences may trigger trauma-related emotions from his childhood with his mother,

where he felt unsafe and unprotected, and his home was unstable." *See* Ex. 2, Dr. Patel Psych

Eval.

81.     As his mental health disability has drastically worsened over time the longer he is

detained, and without having access to appropriate services, A.R.D.A. faces significant barriers

in presenting his asylum claims and communicating with counsel while he remains detained.

Counsel for A.R.D.A. had to file a motion for a finding of incompetency and implementation of

safeguards pursuant to *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011), and the Immigration

Judge scheduled a hearing for [redacted], to determine if A.R.D.A. lacks sufficient competency

in his removal proceedings. Ex. 26, Matter of M-A-M- Hearing Notice. A.R.D.A. has trouble

communicating, as a result of his disability, *see* Ex. 4, Jimenez Moran Decl. ¶ 3.c., which is

amplified by Defendants' actions causing his prolonged detention and denying him equal and

equally effective access to the asylum process on the basis of his disability.

82.     Upon release, A.R.D.A. will be able to receive proper therapeutic, home-based

mental health care services administered through the [redacted] Behavioral Health

Administration and the [redacted]County Bureau of Behavioral Health. As an individual who

will have a pending application for asylum, he will be eligible for full Medicaid and Maryland

Children's Health Program coverage to qualify for this appropriate mental health care through

home-based mental health services. *See* Ex. 25, [redacted] Department of Health Immigration

Status Requirement for Medicaid. A.R.D.A.'s family-member sponsor is eager to care for

A.R.D.A. and ensure that he receives the proper mental health services that he needs.

### E.  A.R.D.A. Imminently Faces Yet Another Traumatizing Transfer

83.     NOVA is scheduled to end its detention of immigrant children on September 4,

2018. Upon information and belief, Defendants plan to imminently transfer A.R.D.A. to another

secure facility, either Yolo or Shenandoah, as early as today. A.R.D.A.'s continued detention of

over one year and three months, which has included two transfers and at least two emergency

commitments, at least one that was involuntary, has been highly traumatic. Transferring him

again to another facility will put him at risk of severe retraumatization, exacerbating and

continuing his mental disability. This pending transfer provides another potential reason as to

why ORR may be delaying a decision on A.R.D.A.'s reunification, despite transfer not being

rationally related to a legitimate purpose for detention.

84.     Children need stable environments, and transferring them creates a constant state

of anxiety and uncertainty that abbreviates their development. The Centers for Disease Control

recommends that safe, stable, environments and caregivers are "fundamental to healthy brain

development" and "shape the development of children's physical, emotional, social, behavioral,

and intellectual capacities, which ultimately affect their health as adults."[42] A.R.D.A.'s detention

has been anything but safe and stable. *See* Ex. 4, Jimenez Moran Decl. Transferring him for a

third time will further only further contribute to delays in his immigration proceedings

effectively denying him equal access to the asylum process on the basis of disability.

---

[42] *See* Centers for Disease Control National Center for Injury Prevention and Control Division of Violence
Prevention, "Essentials for Childhood: Steps to Create Safe, Stable, Nurturing Relationships and Environments,"
*available at* https://www.cdc.gov/violenceprevention/pdf/essentials_for_childhood_framework.pdf.

85.     A.R.D.A.'s mental disability is not a legitimate purpose for Defendants to continue to indefinitely detain A.R.D.A. and certainly not in his best interest. A.R.D.A. needs to be promptly released in the least restrictive setting, through reunification with his family-member sponsor in the community, so that he can receive adequate care including home-based mental health services.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

86.     Paragraphs 1 through 1-85 are incorporated herein.

87.     The TVPRA mandates that ORR "promptly" place Petitioner "in the least restrictive setting that is in the best interest of the child". 8 U.S.C. § 1232(c)(2)(A).

88.     The Defendants' (1) ongoing refusal to place Petitioner in the least restrictive setting and reunify him with his sponsor; (2) arbitrary transfer of Petitioner across the country, which interfered with an established attorney-client relationship, interrupted the adjudication of his asylum case, and contributed to his deteriorating mental health; and (3) refusal to consent to the jurisdiction of the Alexandria, Virginia Juvenile and Domestic Relations District Court violate 8 U.S.C. § 1232(c)(2)(A) and harm Petitioner by prolonging his detention in a highly restrictive setting that is not in his best interest.

89.     Petitioner's continued detention violates the TVPRA and its implementing regulations.

90.     Defendants' actions as set forth above violate the TVPRA.

### SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution

91.     Paragraphs 1 through 1-85 are incorporated herein.

92.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution

provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process

of law."  U.S. Const. amend. V.

93.     Due process requires that ORR place A.R.D.A. in the least restrictive setting, that

custody be reasonably related to reunifying him with his sponsor, and that adequate procedures

ensure those goals are met. Due process does not permit ORR to indefinitely detain and deprive

A.R.D.A. of his liberty for the purpose of his mental health disability. Family members

caretakers have a due process right to care for children and children have a due process right to

be raised and nurtured by family member caretakers. *See D.B. v. Cardall*, 826 F.3d 721, 740 (4th

Cir. 2016) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). ORR

detention of a minor over the objection of a caregiver seeking to sponsor and reunify with a child

violates due process. *Beltran v. Cardall*, 222 F. Supp. 3d. 476 (E.D.Va. 2016); *Santos v. Smith*,

260 F. Supp. 3d. 598 (W.D.Va. 2017).

94.     Defendants' failure to reunify Petitioner with his sponsor unlawfully deprives

Petitioner of his liberty in violation of the Fifth Amendment, the binding *Flores* settlement

agreement, and the agency's established policy to "promptly place an unaccompanied child in

the least restrictive setting that is in the best interests of the child" that "takes into consideration

the unique nature of each child's situation and incorporates child welfare principles…that are in

the best interest of the child". [43]

---

[43] *See* "Unaccompanied Alien Children", *available at*: https://www.acf.hhs.gov/orr/programs/ucs (last visited 7/30/2018).

95.    Defendants' actions as set forth above violate the Petitioner's rights under the Due Process Clause of the Fifth Amendment of the United States Constitution because his detention is not reasonably related to the purpose of reunifying him with his sponsor, and because it affords him no adequate procedural protections.

### THIRD CLAIM
### Violation of the Administrative Procedures Act (APA)

96.    Paragraphs 1 through 1-85 are incorporated herein.

97.    The Administrative Procedures Act prohibits unreasonable delays and arbitrary and capricious agency action. Section 706(1) of Title 5 provides that a reviewing court shall compel agency action unlawfully withheld. 5 U.S.C. § 706(1).

98.    Petitioner has statutory and due process rights to be "promptly" placed "in the least restrictive setting that is in the best interest of the child". *See* 8 U.S.C. § 1232(c)(2)(A).

99.    The Defendants have a duty to ensure that custody be reasonably related to reunifying Petitioner with his sponsor, and that adequate procedures ensure those goals are met.

100.    Defendants' arbitrary transfer of A.R.D.A. across the country within the same level of security and refusal to consent to the jurisdiction of the Alexandria, Virginia Juvenile and Domestic Relations District Court constitute final agency action under the APA. Defendants' decision to apply its policies and procedures for "sponsoring" an "unaccompanied alien child" is also a final agency action for purposes of the APA.

101.    Defendants' (1) ongoing refusal to place Petitioner in the least restrictive setting and reunify him with his sponsor; (2) arbitrary transfer of A.R.D.A. across the country within the same level of security; and (3) refusal to consent to the jurisdiction of the [redacted] Juvenile and Domestic Relations District Court without a legitimate justification have harmed Petitioner by

prolonging his detention in a highly restrictive maximum secure setting that is not in his best

interests, amounting to arbitrary and capricious actions in violation of the APA. Defendants'

failure to make a decision on Petitioners' reunification application, which has been subject to

Defendant Lloyd's Director Review Policy, is "the zenith of arbitrary and capricious

administrative actions." *L.V.M.*, No. 18 CIV. 1453 (PAC), 2018 WL 3133965 at \*20.

102.   There are no other adequate remedies available.

103.   In light of Defendants' mission to "promptly place" minors into the "least

restrictive setting that is in the best interest of the child," Defendants' actions as set forth above

and insistence that A.R.D.A. remain detained constitute an unlawful withholding of an agency

action that is arbitrary, capricious, and an abuse of discretion in violation of the APA.

### FOURTH CLAIM
### Violation of Section 504 of the Rehabilitation Act and Implementing Regulations
### (Petitioner A.R.D.A. only)

104.   Paragraphs 1 through 1-85 are incorporated herein.

105.   Section 504 of the Rehabilitation Act of 1972 ("Section 504") provides that "no

otherwise qualified individual with a disability… shall, solely by reason of his or her disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a); *see*

*also* § C.F.R. 15.30. The regulations implementing Section 504 prohibit entities receiving federal

financial assistance from utilizing "criteria or methods of administration (i) that have the effect

of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that

have the purpose or effect of defeating or substantially impairing the accomplishment of the

objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R.

§ 104.4(b)(4).

106.     Disability is defined to include "a physical or mental impairment that substantially limited one or more major life activities…" 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102. A.R.D.A. suffers from the effects of a trauma-related mental health disability, including [redacted]. The effects cause an impairment that limits A.R.D.A.'s memory and ability to concentrate and communicate, lack of responsiveness, and causes him to suffer [redacted], struggle with explicit factual recall, and face serious [redacted]. A.R.D.A. thus has a physical or mental impairment that substantially limits one or more major life activities. There is a presumption that A.R.D.A. is "otherwise qualified" to participate in removal proceedings currently pending against him and in affirmative asylum proceedings, as well as in this programs and activities of his placement by ORR in a secure facility.[44]

107.     One or more Defendants is subject to the Rehabilitation Act due to being a program that receives extensive federal funding. The secure facility at which A.R.D.A. is currently detained by ORR has received substantial federal financial assistance. Immigration proceedings, including asylum adjudications before USCIS and removal proceedings prosecuted by ICE before an Immigration Judge, are federal programs. Defendants have a legal duty to provide reasonable accommodations to A.R.D.A. to ensure his meaningful access to the federal program of asylum and removal proceedings.

108.     Defendants' prolonged detention of A.R.D.A., decision to arbitrarily transfer him, and failure to release him to his sponsor have exacerbated A.R.D.A.'s existing limitations in communication, including when speaking about his past trauma. As a result, A.R.D.A. faces

---

[44] Should the Immigration Judge find A.R.D.A. mentally incompetent at his *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011) hearing on August 8, 2018, that would result in the implementation of safeguards; not disqualify him from participating in his removal proceedings.

barriers in presenting his claims and communicating with counsel and is being denied equal and equally effective access to the asylum process on the basis of disability.

109.    A.R.D.A. has been denied the opportunity to participate in or benefit from the Defendants' services, programs or activities, or has been otherwise discriminated against by the Defendants because of his disability. In detaining A.R.D.A. indefinitely in a highly restrictive detention setting without making a decision on his reunification, the Defendants have failed to provide A.R.D.A. reasonable accommodations in the asylum, removal, and sponsor placement process. Instead, Defendants have exacerbated A.R.D.A.'s disabilities, interfered with his ability to meaningfully participate in immigration proceedings, excluded him from the protections afforded by asylum statutes, and discriminated against A.R.D.A. on the basis of his disability.

110.    Defendants have been on notice of A.R.D.A.'s disabilities and requests for reasonable accommodations such as step down to a less restrictive setting and reunification to his family-member sponsor no late than the date of filing of the complaint. Defendants have not granted these requests.

111.    There are effective reasonable accommodations that Defendants could implement. In particular, Defendants could immediately release A.R.D.A. to the least restrictive setting in the custody of his family member sponsor. Defendants have failed to implement any reasonable accommodations.

112.    The reasonable accommodation requested by A.R.D.A. would not be unduly burdensome nor would it require a fundamental alteration in the program. Defendants have already completed a substantial part of the reunification process, including conducting a Home Study on the sponsor. Additionally, the burden of showing that any such relief or

accommodation would require a fundamental alteration or pose an undue burden rests with Defendants. 6 C.F.R. § 15.50(a)(2).

113.    Defendants' policy to subject A.R.D.A., an asylum-seeker suffering from a trauma-related disability, to prolonged detention constitutes discrimination under the Rehabilitation Act because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities. A.R.D.A.'s ability to participate in the asylum, removal, and sponsorship processes undoubtedly involves critical decision-making, potential recounting of traumatic events, and other essential matters which are significantly affected by his disability. Defendants intentionally are preventing A.R.D.A. from coping with, processing, and speaking about the experiences of violence, persecution, and loss that contributes to his disability and form the basis for his asylum claim.

114.    As a result of this discrimination and failure to reasonably accommodate A.R.D.A.'s disabilities, and solely based on his disability, A.R.D.A. cannot receive the benefits of the asylum process or the placement by Defendants in a secure facility. A.R.D.A. has suffered and will imminently suffer irreparable injury as a result of continued detention and is entitled to injunctive relief to avoid any further injury. By detaining A.R.D.A., Defendants have denied A.R.D.A. equal and effective access to a federal program in violation of the Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, A.R.D.A. and Mr. Rosales Dubon respectfully request that the Court:

A.    Assume jurisdiction over this matter;

B.    Grant A.R.D.A's petition for a writ of habeas corpus;

C.    Order Defendants to immediately release A.R.D.A. to the custody of his cousin Mr. Rosales Dubon;

D.      Declare that Defendants' actions, including the prolonged detention of A.R.D.A.,

violate the TVPRA, the Due Process Clause, the Administrative Procedure Act, and Section 504

of the Rehabilitation Act and its implementing regulations;

E.      Order that the Government reimburse the attorneys' fees and expenses incurred in

connection with this Petition, under the Equal Access to Justice Act 5 U.S.C. § 504, 28 U.S.C. §

2412; and

F.      Grant any further relief that this Court deems just and proper.


Dated: July 30, 2018                    Respectfully submitted,

                                        /s/  *Adina Appelbaum*
                                        Adina B. Appelbaum (VSB No.: 88974)
                                        David J. Laing (pro hac vice application
                                        pending)
                                        Claudia R. Cubas (pro hac vice
                                        application pending)
                                        **CAPITAL AREA IMMIGRANTS' RIGHTS
                                        (CAIR) COALITION**
                                        1612 K Street, Northwest
                                        Suite 204
                                        Washington, D.C.  20006
                                        Tel: (202) 899-1412
                                        Fax: (202) 331-3341
                                        adina@caircoalition.org

                                        *Pro Bono Attorneys for Plaintiffs/Petitioners
                                        A.R.D.A. and Mr. Rosales Dubon*